UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>JASON DONALD SCHMIDLKOFER,<br><br>　　　　　　　　Defendant. | Case No. 3:20-cr-00065-TMB-MMS<br><br>**FINAL REPORT AND RECOMMENDATION REGARDING MOTION TO SUPPRESS EVIDENCE [DOC. 30]** |

## I.　　MOTION PRESENTED

Defendant Jason Donald Schmidlkofer ("Schmidlkofer") was charged in a two-count indictment with (1) felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (2) possession of a firearm in furtherance of a federal drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). [Dkt. 2].

Schmidlkofer, through counsel, filed a Motion to Suppress Evidence, seeking to suppress all evidence obtained from the January 21, 2020 alleged "unlawful stop and seizure" that led to the current charges. [Dkt. 30 at 1]. In the Motion, Schmidlkofer argues that when officers blocked in his vehicle, preventing him from leaving, he was seized; and because they did so without any prior evidence of criminal activity, or other legal basis, that seizure was illegal; thus all evidence obtained as a result of that seizure must be suppressed. [Dkt. 30 at 3-4]. Among the items of evidence Schmidlkofer seeks to suppress

are a Bersa .380 handgun, and a bag containing lab-confirmed heroin and methamphetamine. [Dkt. 37-1 at 3].

The Government filed a Response in Opposition to the Motion. [Dkt. 37]. In its opposition, the Government acknowledged a seizure took place when officers blocked in Schmidlkofer's vehicle. [*Id*. at 4]. However, the Government contends that the seizure was lawful based on three independent rationales: (1) the reasonable suspicion that Schmidlkofer was illegally parked; (2) the reasonable suspicion that Schmidlkofer was operating under the influence; and (3) the community caretaker doctrine. [*Id*. at 1].

On March 26, 2021, the Court held an evidentiary hearing on the Motion to Suppress. [Dkt. 48]. At the evidentiary hearing, the Court indicated any supplemental post-hearing briefs should be filed by April 9, 2020. [*Id.*]. The Government filed a Supplemental Opposition to the Motion to Suppress on April 9, 2020. [Dkt. 54]. On April 10, 2021, Schmidlkofer filed a Supplemental Brief on Defense Motion to Suppress, along with a Motion to Accept a Late Filed Supplement Briefing. [Dkts. 55, 56]. The Court accepted Schmidlkofer's untimely supplemental brief. [Dkt. 57].

An initial report and recommendation issued on June 4, 2021, recommending denial of the Motion. [Dkt. 63]. Schmidlkofer filed an objection to the initial report and recommendation; and the Government subsequently replied to the objection. [Dkts. 64, 65].

For the reasons set forth below, Schmidlkofer's Motion to Suppress Evidence should be **DENIED**.

## II. FACTUAL BACKGROUND

On the frigid early morning hours of January 21, 2020, a police dispatcher received two calls regarding a loud noise on Cope Street in Anchorage.[1] [Dkt. 37-2 at 1]. The first caller indicated that it sounded like a vehicle was having loud engine trouble, as if "something was about to explode." [*Id.*]. At one point during the call, the caller stepped outside, and the dispatcher was able to hear "what sounded like a train rattling on the tracks." [*Id.*]. According to the caller, the sound was coming from across Cope Street. [*Id.*]. A second caller advised that it sounded like something was wrong with a car. [*Id.*].

At 4:47 a.m., Anchorage Police Officer Robinson[2] responded to the call and was sent to 3404 Cope Street. [*Id.*]. While Robinson was on the way to the area, the dispatcher contacted Officer Reeves to assist. [Dkt. 51 at 8]. Robinson was first to arrive onto Cope Street. [*Id.*]. He proceeded to drive down the street with his windows down, listening for the source of the loud noise. [*Id.*].

Robinson noticed a 2000 Gray Dodge Durango parked haphazardly – partially in the road, blocking the driveway of 3407 Cope Street, and facing the opposite direction of

---

[1] The Government's Opposition to the Motion to Suppress included weather reports and meteorological documents showing the temperature in Anchorage was "well below freezing" on the morning of January 21, 2020. [Dkt. 37-4 at 1-16; Dkt. 44-1]. At the evidentiary hearing, the parties stipulated to the fact that it was cold outside that morning. [Dkt. 51 at 4]. Additionally, the WatchGuard footage from Reeves' car shows Reeves driving on snow-covered streets. [Evid. Hrng. Ex. 5 at 00:05-00:43].

[2] At the evidentiary hearing, Officer Robinson testified to his training and experience: specifically, he indicated that he knew vehicles make a "dieseling noise" when they run out of gas, which continues as "the vehicle is trying to siphon the last little bits of gas." [Dkt. 51 at 40].

traffic. [*Id.* at 9]. Robinson noticed the snow beneath the vehicle had melted away and believed this meant the vehicle had been previously running for some time.[3] [*Id.*]. Robinson drove past the vehicle but did not see anyone inside. [Dkt. 51 at 8]. He turned his patrol car around and drove past the vehicle again. [*Id.* at 59-20]. At this point, Robinson noticed an individual, later identified as Schmidlkofer, in the driver's seat of the Durango. Schmidlkofer appeared to be "not conscious" – "sleeping or not alert." [*Id.* at 16, 59-60]. Robinson confirmed that the unconscious driver did not have a blanket or sleeping bag covering him; nor was he wearing a hat.[4] [*Id.* at 36-37]. Robinson pulled in behind the Durango and parked within an inch of the rear bumper.[5] [*Id.* at 60]. While Reeves was en route to Cope Street, Robinson asked Reeves to block in the Durango from the front when she arrived, so that they could "make contact with the driver." [*Id.* at 46]. At some point

---

[3] *See supra* ftnt. 1; officers responded to this call in late-January in Anchorage, Alaska. The WatchGuard footage from Reeves' car shows Reeves driving on snow covered streets and past snow-covered cars before arriving to Cope Street. [Evid. Hrng. Ex. 5 at 00:05-00:43]. This Court also notes the Durango did not have its exterior lights on in the WatchGuard footage [*Id.*]; additionally, Robinson testified to the ignition not running, but the dashboard lights and radio were on. [Dkt. 51 at 53-55].
[4] The lack of warm coverings on the unconscious driver was specifically noted as a concern to Robinson due to the low temperatures and the way the "person in the car [was] slumped over [the center console]." [Dkt. 51 at 44].
[5] Robinson testified that over his 25-year career, he deals with at least two to three "OUIs," or "operating under the influence" calls, a week. [*Id.* at 17]. He indicated that in those situations, drivers sometimes get startled after regaining consciousness and attempt to drive off. [*Id.* at 19]. Robinson indicated that the driver's response is a safety concern to pedestrians and property—including buildings, fences, homes, and other cars. [*Id.* at 17, 63]. Officer Robinson also testified to his experience in observing individuals suffering from hypothermia and responses he has seen from startled individuals suffering from hypothermia. [*Id.* at 39].

before Reeves arrived, Robinson also told her that he thought the vehicle had run out of gas.[6] [Dkt. 37-2 at 1].

Reeves arrived onto Cope Street and parked directly in front of the Durango, leaving enough space for her to efficiently walk in front of the vehicle, but intending to block the Durango from leaving in a quick manner. [Dkt. 51 at 70; Evid. Hrng. Ex. 5 at 00:58 and 02:39 – 02:40[7]]. A few seconds later, Robinson exited his vehicle and approached the Durango from the rear driver's side. [Dkt. 51 at 70, 76; Evid. Hrng. Ex. 5 at 01:11]. Reeves approached the vehicle from the front passenger side. [Dkt. 51 at 70, 76; Evid. Hrng. Ex. 5 at 01:16]. Robinson observed that Schmidlkofer had his seatbelt on, and although the car was not running, the key was in the ignition and turned to the on position; "extremely loud" music was playing inside; and some of the dashboard lights were on. [Dkt. 51 at 22, 77].

Robinson began "pounding" on the driver's side window. [Dkt. 51 at 23]. A few seconds later, Schmidlkofer jolted upright and immediately put his hands up. [Evid. Hrng. Ex. 5 at 01:38; Dkt. 51 at 79]. Schmidlkofer began to make "erratic" movements, reaching for the gear shift, and then trying to start the vehicle by using the key in the ignition. [Dkt. 37-1 at 2; 37-2 at 2; Evid. Hrng. Ex. 5 at 01:39]. Schmidlkofer opened the car door and Robinson stepped into the doorway. [Dkt. 51 at 24; Evid. Hrng. Ex. 5 at 01:46].

---

[6] *See* discussion *supra* ftnt 2 regarding Officer Robinson's knowledge based on his experience what a vehicle running out of gas sounds like.

[7] From 02:39 to 02:40 in the WatchGuard video, Reeves is seen quickly moving from the passenger side of the Durango to the driver side without manipulating her movements to get to the other side once a struggle ensued between Robinson and Schmidlkofer.

*United States v. Schmidlkofer*     5
3:20-cr-00065-TMB-MMS-1
Final R&R on Motion to Suppress

Robinson identified himself as a police officer, told Schmidlkofer to calm down, and asked him to stop "messing" with the ignition. [Dkt. 51 at 24]. Robinson began asking Schmidlkofer questions, including asking where Schmidlkofer was coming from and whether Schmidlkofer knew where he was. [*Id.* at 25]. Schmidlkofer continued making sudden movements and reaching inside the vehicle. [*Id.*; Dkt. 51 at 78; Evid. Hrng. Ex. 5 at 02:08-02:20]. Robinson again commanded Schmidlkofer to stop touching the vehicle's gear shift and ignition. [Dkt. 51 at 25].

At this point, when Schmidlkofer leaned towards Robinson, Reeves saw the grip of a handgun on Schmidlkofer's right hip. [Dkt. 37-2 at 2; Dkt. 51 at 78-79; Evid. Hrng. Ex. 5 at 02:28]. Reeves unholstered her gun, yelled to Robinson that there was a gun, and called for additional units over the radio. [*Id.*; Dkt. 37-2 at 2; Dkt. 51 at 78-79]. Approximately fifty-seven seconds elapsed between the moment Robinson first knocked on the driver window and when Reeves indicated she saw a firearm on Schmidlkofer's person. [Evid. Hrng. Ex. 5 at 01:31-02:28].

After hearing Reeves' warning, Robinson drew his weapon, and ordered Schmidlkofer to, "Let me see your hands." [Dkt. 51 at 26; Evid. Hrng. Ex. 5 at *approx.* 02:28]. Despite Robinson's commands to stay in the vehicle, Schmidlkofer forced his way out of the car, pushing Robinson back. A struggle between them ensued. [*Id.* at 02:38-02:48; Dkt. 51 at 27]. Reeves came quickly around from the passenger side to the driver's side to assist and avoid a possible crossfire with Robinson on the other side of the Durango. [*Id.* at 27, 80; Evid. Hrng. Ex. 5 at 02:38 – 02:40]. Robinson brought Schmidlkofer, who

*United States v. Schmidlkofer*  6
3:20-cr-00065-TMB-MMS-1
Final R&R on Motion to Suppress

was still wrapped in his seatbelt, onto the ground. [Dkt. 37-1 at 2; Dkt. 51 at 80]. Because Robinson and Reeves could not see the gun, nor Schmidlkofer's hands, they kept Schmidlkofer pinned down on the ground. [Dkt. 37-1 at 2]. Another officer arrived and advised Robinson and Reeves that he could see a handgun underneath the driver's side of the car. [*Id.*]. As other officers arrived on scene, Robinson conducted a search of Schmidlkofer's person and found, among other items, a clear plastic bag containing methamphetamine and heroin. [*Id.* at 3].

### III. DISCUSSION.

As established at *supra* 2, the Government acknowledges that a seizure took place when officers blocked Schmidlkofer's Durango, preventing him from leaving. Dkt. 37 at 4; *see also U.S. v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021) ("Once [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen, then a seizure has occurred and the requisite level of justification for the seizure must be shown.") At issue is the level of justification required for the specific seizure Reeves and Robinson utilized with Schmidlkofer. Schmidlkofer contends the seizure must be supported by probable cause since blocking the Durango was tantamount to an arrest[8]; in the alternative, Schmidlkofer claims officers Reeves and Robinson did not have enough

---

[8] At the evidentiary hearing, defense counsel continued to argue officers' use of excessive force in their seizure of the Durango since it was indistinguishable from a seizure or arrest of Schmidlkofer. (Dkt. 51 at 47-49).

articulable facts to reasonably suspect criminal activity was afoot[9], as explained below, this Court disagrees.

A. **General Rule of Law.**

The Fourth Amendment provides the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Generally, officers are required to obtain a warrant based on probable cause to justify a search or seizure. *Terry v. Ohio*, 392 U.S. 1, 20 (1968). In Alaska, an officer may conduct an "investigative stop" of a person upon a "reasonable suspicion that imminent public danger exists or [that recent] serious harm … was caused by [that] person." *Coleman v. State*, 553 P.2d 40, 43 (Alaska 1976). *Coleman*'s position stems from the Supreme Court's holding in *Terry v. Ohio*, that "a police officer may[,] in appropriate circumstances and in an appropriate manner[,] approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22.

Law enforcement may impose "[r]estrictions on a person's freedom of movement … to maintain the status quo while making an initial inquiry provided[,] the force displayed is not excessive under the circumstances." *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) (finding a 15-20 minute delay between a safety inspection being completed and receipt of a warrants check - while a Coast Guard vessel was tied to defendant's vessel

---

[9] Dkt. 30 at 3-5.

- was not an improper seizure, since facts and circumstances surrounding the case support officers' reasonable suspicion that criminal activity was potentially afoot.); *see Adams v. Williams*, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."); *see also U.S. v. Brown*, 996 F.3d at 1004-5 (reenforcing the theory that an officer "may briefly stop [a] suspicious person and make reasonable inquiries aimed at confirming or dispelling [the officer's] suspicions [that criminal activity may be afoot]," but instead of an initial pat-down search, officers exceeded the scope of a *Terry*-stop by reaching directly into defendant's pocket.) (*internal quotations omitted*)); *and also Illinois v. Wardlaw*, 528 U.S. 119, 123 (2000) ("[C]onsistent with the Fourth Amendment, [law enforcement may] conduct a brief, investigatory stop" if the stop is supported by "reasonable, articulable suspicion that criminal activity is afoot.").

Reasonable suspicion is based on "specific, articulable facts which, together with objective and reasonable inferences," form a basis to suspect that a person is engaged in criminal activity. *Thompson*, 282 F.3d at 678 (*internal quotations omitted*). This standard may be based on an officer's experience, specialized training, as well as the officer's ability to make inferences from and about the cumulative information available – to include making reasonable conclusions that may well elude an untrained person. *Thompson*, 282 F.3d at 678 (upholding reasonable suspicion when officers' reliance on all the facts available to them [e.g.. expired/no registration for sea fairing vessel, claimed to be

repairmen but tools on deck looked new and unused, duffle bags similar to those used by other smugglers, crew lied about the direction they were traveling, lack of verifiable owner], along with considering officers' prior experiences and training). Reasonable suspicion "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act…[Courts] must permit officers to make commonsense judgments and inferences about human behavior." *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020)(*internal citations and emphasis omitted*); *see also U.S. v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (upholding reasonable suspicion based on an officer's observations of defendant: defendant's furtive and elusive movements while driver refused to pull car over immediately; defendant's use of opposite hand to open door; and keeping his right hand partially obscured from view and close to his body/pocket of his coat); *see also U.S. v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006). Yet, "officer[s] must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Wardlow*, 528 U.S. at 123-24 (*internal citations omitted*) (holding officers may take into consideration nervous and elusive behavior along with flight in a high crime neighborhood as a bases of reasonable suspicion).

When evaluating a specific set of facts, courts must look at the "totality of the circumstances" of the case to determine if the detaining officer had "objective and reasonable" basis for suspecting wrongdoing. *Burkett*, 612 F.3d at 1107.

Since "reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," this Court will

focus its main analysis on whether officers had reasonable suspicion to block Schmidlkofer from leaving the scene and whether the officers' actions fell within the authorized use of force for a *Terry* stop - detention. *Wardlow*, 528 U.S. at 123-24 (*internal quotations omitted*). "[T]he critical inquiry is whether the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Thompson*, 282 F.3d at 677 (*internal quotations omitted*).

> **a. Did Officer Robinson have reasonable suspicion to believe Schmidlkofer was engaged in criminal activity when he directed Officer Reeves to block in the Durango?**

Considering the totality of the circumstances—giving due weight to Robinson's observations, and the inferences he made from and about the facts available to him—this Court, as explained below, concludes that Robinson had reasonable suspicion to believe criminal activity was afoot when he directed Reeves to block in the Durango, either as an illegally parked vehicle or a driver operating a vehicle under the influence. [Dkt. 51 at 44-46]; *see Whren v. United States*, 517 U.S. 806 (1996); *and Choudhry*, 461 F.3d 1097 (9th Cir. 2006). This Court acknowledges that in the initial report and recommendation, it found that given all of the evidence presented, including Robinson's testimony at the evidentiary hearing, it did not appear that a parking violation was the basis for blocking in the vehicle; and therefore, did not analyze the reasonableness of the seizure under *Choudhry*. After reexamination of the case law, testimony, and objections, this Court finds that *Whren v. U.S.*, along with *Choudhry*, and their progeny, are applicable and provide guidance on

Robinson's reasonable suspicion, as well as the level of seizure executed by both officers under *Terry*. [10]

Although the circumstances in *Burkett*, *Thompson*, and more specifically *Whren* and *Choudhry,* are facially different from the current scenario of an unconscious Schmidlkofer—partially sprawled over the center console of the Durango—the basic application of how the officers relied on their training, experience, common sense, and intuition, result in the same finding of reasonable suspicion as the cases referenced. [Dkt. 51 at 45]; *see Burkett*, 612 F.3d at 1107; *and Thompson*, 282 F.3d at 677. Specifically, both Robinson and Reeves noted the odd manner the Durango was parked, partially blocking the road and a driveway; and both officers were aware that blocking a driveway was a traffic violation[11]. [Dkt. 51 at 44-46]; *Whren*, 517 U.S. at 810; *United States v. Choudhry*, 461 F.3d at 1098.[12]

---

[10] The Government's response in Opposition to the Motion to Suppress argued that officers were authorized to seize Schmidlkofer because he was illegally parked. [Dkt. 37 at 4]. A traffic violation can provide reasonable suspicion to conduct an investigatory stop. *See United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (*citing Whren v. United States*, 517 U.S. 806, 810 (1996)).
[11] Anchorage Municipal Code -9.30.300.
[12]
> parking infractions constitute traffic violations under California's Vehicle Code and local laws enacted pursuant to the Vehicle Code, and because the officers had the authority to enforce the particular violation at issue, we hold that a civil parking violation under California's Vehicle Code falls within the scope of the Supreme Court's decision in *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). Accordingly, we conclude that the parking violation provided the officers with reasonable suspicion to conduct an investigatory stop of the vehicle.

The instant analysis differs from that of the initial report and recommendation in that under *Whren*, even if an officer had not have enforced a parking violation exactly as occurred in the instant scenario, a municipal code traffic violation is enough to provide an officer with probable cause, a standard much higher than reasonable suspicion, to conduct an investigatory stop. *Whren*, 517 U.S. at 810 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.")

Additionally, before encountering Schmidlkofer, Robinson knew—based on the information conveyed to him by dispatch—that a vehicle on Cope Street was making loud noises, as if something was "about to explode." [Dkt. 37-2 at 1]. Robinson knew, from his experience and training, that when vehicles run out of gas, they can make a loud "dieseling noise," as the car tries to "siphon the last little bits of gas." [Dkt. 51 at 40]. When he arrived on Cope Street, Robinson did not hear the "train rattling on the tracks" sound that a caller described. [*Id.* at 8]. He did, however, see an unusually parked vehicle blocking a driveway, partially obstructing the road, and facing the opposite direction of street traffic. [Dkt. 51 at 9-10]. Robinson noticed the snow beneath the vehicle had melted away, which suggested to him that—even though the car was not running when he arrived—the vehicle had previously been running for an extended period. [*Id.* at 9-10, 42]. Those facts, taken as a whole, support Robinson's inference that the Durango may have run out of gas and was possibly the vehicle making loud noises on Cope Street.

*United States v. Schmidlkofer*                                                                                                      13
3:20-cr-00065-TMB-MMS-1
Final R&R on Motion to Suppress

Once Robinson saw a "man asleep at the wheel," slumped over the vehicle's center console, in an illegally parked car, in the early hours of the morning—when there was evidence that the car had been recently running and had likely run out of gas— it is entirely "consistent with [a] hypothesis" that the driver was potentially operating the vehicle while under the influence, which is in violation of the law, or consistent other criminal activity. [Dkt. 51 at 46]; *see Terry*, 392 U.S. at 28; *Choudhry*, 461 F.3d at 1100 ("Investigatory traffic stops are akin to the on-the-street encounters addressed in *Terry*...accordingly, the same objective standard applies: a police officer may conduct an investigatory traffic stop if the officer has reasonable suspicion[.]")(*internal quotations and citations omitted*)

Given the facts and circumstances surrounding the situation facing Robinson, asking Reeves to block the Durango so it could not leave was not an exceptionally invasive tactic for officers to hold the status quo while they assessed the scene. *Thompson*, 282 F.3d at 677. With the Durango blocking a driveway[13], an unconscious driver who possibly was operating a vehicle while under the influence.[14], while the vehicle parked the opposite direction of traffic, and partially blocking the road[15], and even though Robinson admitted

---

[13] Blocking the driveway is a violation of the traffic code that is enforceable by the officers of the Anchorage Police Department.
[14] *See* AS 28.35.030(a)(1). ("A person commits the crime of driving while under the influence … if the person operates or drives a motor vehicle … while under the influence of an alcoholic beverage, intoxicating liquor, inhalant, or any controlled substance, singly or in combination."). O.U.I. is a violation of Alaska Statute and a Class A misdemeanor.
[15] When reviewing the video, this Court cannot determine if the Durango was more than the allocated "wheels parallel to and within 18 inches of the curb or roadway" Anchorage Municipal Code 9.30.180(B); or if the Durango specifically left "less than 20 feet of roadway available for free movement of vehicular traffic." *See* Anchorage Municipal

that he "[had] no idea if" Schmidlkofer was in fact impaired by alcohol or drugs; or if the vehicle was entirely disabled[16]; reasonable suspicion requires merely a "minimal level of objective justification." *Wardlow*, 528 U.S. at 123; *see Thompson*, 282 F.3d at 679.

Weighing the totality of the circumstances, it cannot be said that Robinson had "a mere hunch" of illegal activity, rather there were enough indicators to provide Robinson with reasonable suspicion that something was amiss. *See Thompson*, F.3d at 678*; Burkett*, 612 F.3d at 1107*.* As the Supreme Court has noted, "the specific content and incidents of [the Fourth Amendment] right must be shaped by the context in which it is asserted. For what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.' *Terry*, 392 U.S. at 9 (*internal citations omitted*). The seizure of Schmidlkofer in the circumstances surrounding Officer Robinson's and Reeves' contact with Schmidlkofer are not, in this Court's view, unreasonable.

### b. Was blocking Schmidlkofer's vehicle an excessive use of force that outweighs the governmental interest in protecting the community from a possible driver under the influence?

The reasonableness of a seizure concerns (1) the level of suspicion officers possessed to justify their intrusion and (2) the manner in which a seizure is conducted.

---

Code 9.30.040 - <u>Parking not to obstruct traffic</u> - "No person shall park any vehicle upon a street other than an alley in such manner or under such conditions as to leave available less than 20 feet of roadway available for free movement of vehicular traffic."
[16] *See* Anchorage Municipal Code – Chapter 9.30.

*Brown*, 996 F.3d at 1006[17]. Having determined that there was reasonable suspicion for the seizure, this Court now addresses the manner in which the seizure was conducted, and as discussed below, concludes that blocking in the Durango was not "excessively forceful," nor tantamount to an arrest. *Adams*, 407 U.S. 143, 148 ("Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable.") Although *Adams* considers information from a reliable informant in its analysis of whether the level of intrusion was justified under *Terry*, this Court does not give weight to the two 911 calls that proceeded the seizure of Schmidlkofer; rather this Court views the actions of Robinson and Reeves as reasonable in light of the circumstances.

When Robinson asked Reeves to block in the Durango, Robinson believed that Schmidlkofer—who was unconscious—was possibly impaired by alcohol or suffering a medical emergency.[18] "[D]raw[ing] on [his] experience and specialized training," Robinson knew that unconscious drivers are sometimes startled after being woken up and some try to flee—placing pedestrians, homes, vehicles, and themselves in danger. *Arvizu*,

---

[17]
> In distinguishing between a *Terry* stop and a full-blown arrest, we consider whether a reasonable person would believe that he or she is being subjected to more than a temporary detention, as well as the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken[.] (*internal citations and quotations omitted*)

[18] "[F]rom what I observed, this is what we call a man asleep at the wheel. I have no idea if he's impaired by alcohol, if he's had a heart attack, if this is a diabetic issue. The concern is, is when I wake this person up, what is this person going to do." [Dkt. 51 at 46].

534 U.S. at 273. This Court finds it credible that Robinson, given the "facts known to [him] at the time," believed blocking in Schmidlkofer's vehicle was necessary to prevent possible harm to the community and to Schmidlkofer. *See Adams*, 407 U.S. at 146. In *Whren,* the Supreme Court "held that a traffic violation was sufficient to justify an investigatory stop, regardless of whether (i) the violation was merely pretextual, (ii) the stop departed from the regular practice of a particular precinct, or (iii) the violation was common and insignificant." *Choudhry*, 461 F.3d at 1102 (*citing Whren, 517 U.S. at 811-12, 814-15, 818-19*). Any intrusion of Schmidlkofer's Fourth Amendment rights that resulted from blocking in his vehicle while he was unconscious was not unreasonable, nor excessive.

Because the officers had reasonable suspicion under the totality of the circumstances to seize the Durango long enough to conduct further investigation, and the manner in which the seizure as conducted was reasonable, the Court finds no violation of Schmidlkofer's Fourth Amendment rights.

## IV. OBJECTIONS

After the initial report and recommendation, Schmidlkofer objected to the following: 1) the Court's factual findings that Schmidlkofer's Durango was blocking the driveway and/or part of the street; the use of the word "unconscious" instead of stating Schmidlkofer was "not conscious"; and the factual reasonings behind Robinson's thought process for blocking in the vehicle; 2) the Court's legal analysis for blocking in a vehicle and its failure to use cases cited by defendant's motion and supplemental; the Court's use of *Guzman-Padilla* as authority, since it involves the border patrol/"extended border search

doctrine" and should not be applicable for *seizure* cases; and the applicability of the community care taker doctrine and/or the use of the 911 calls as a basis for "pinning [Schmidlkofer] in." [Dkt. 64 at 1-5].

First, the factual inferences and findings this Court made: The vehicle *was* blocking the driveway, uncontroverted testimony from Robinson established this. Additionally, the statement that the vehicle was blocking part of the road: reviewing the in-camera video as well as the testimony from both officers, this Court stands by the determination that the Durango's back end was further in the road than the front hood. Since the road was covered in snow, it is difficult to determine the exact width of the road, but there are no other vehicles parked on either side of Cope Street. Cope Street is a side street and it is evident that two vehicles would not have been able to pass by the "parked" Durango at the same time.[19]

The second objection is to the Court using the term "unconscious" instead of "asleep or not conscious." This objection is frivolous. The most authoritative work on the use of modern English provides that "unconscious" has the sense of "not having knowledge or awareness of a fact or circumstance; unaware, heedless; unwitting" or "not having the

---

[19] Anchorage Municipal Code: 9.30.040 - Parking not to obstruct traffic. "No person shall park any vehicle upon a street other than an alley in such manner or under such conditions as to leave available less than 20 feet of roadway available for free movement of vehicular traffic."

faculty of consciousness"[20]. Black's Law Dictionary provides the following definition of "unconscious": "Without awareness; *not conscious*"[21] (emphasis added). As a matter of common sense and common usage, "un-" is a prefix which simply means "not", e.g.: unbeatable, unbelievable, unstoppable. Thus "unconscious" and "not conscious" are synonyms, and the objection is without merit.

As to the defense's use of cases specifically referenced in the initial Motion, supplemental filing, and reiterated in the objection: This Court found the cases inapposite and outside the scope of the facts presented. This Court did take into consideration the objection towards its use of "extended border search doctrine" cases and the community care doctrine analysis; hence the deletion of such cases and section. As such, the Court assessed the objections and incorporated them fully into this Final Report and Recommendation.

## V.  CONCLUSION

In sum, this Court recommends that the District Court **DENY** the Motion to Suppress at Docket 30.

DATED this 29th day of June 2021, at Anchorage, Alaska.

s/ Matthew M. Scoble  
United States Magistrate Judge

---

[20] *See*, Oxford English Dictionary, https://www.oed.com/view/Entry/210776?redirectedFrom=unconscious#eid. Last visited, June 29, 2021.

[21] Black's Law Dictionary, 10th Ed.